## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) | February 25, 2021 |
| YALE UNIVERSITY, | ) ) | JURY TRIAL DEMANDED |
| Defendant, | ) ) | |

## COMPLAINT

Plaintiff Students for Fair Admissions, Inc. ("SFFA") brings this action to obtain, *inter alia*, declaratory and injunctive relief to remedy Yale University's racial discrimination in its administration of its undergraduate admissions program.

## JURISDICTION AND VENUE

1.      This action arises under 42 U.S.C. §2000d *et seq*. This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1343.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b). The Defendant is located in Connecticut, and a substantial part of the events or omissions giving rise to this cause of action took place in this judicial district.

## PARTIES

3.      Plaintiff is Students for Fair Admissions, Inc. ("SFFA").

4.      SFFA is an Internal Revenue Code Section 501(c)(3), voluntary membership organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and other lawful means.

1

More specifically, SFFA promotes and protects the right of the public to be free from discrimination on the basis of race in higher-education admissions.

5.     SFFA is a nonprofit membership group of more than 20,000 students, parents, and others who believe that racial classifications and preferences in college admissions are unfair, unnecessary, and unconstitutional. SFFA has members throughout the country.

6.     SFFA has at least one member ("Applicant") who applied for and was denied admission to Yale's 2020 entering class.

7.     Applicant, who is Asian-American, was denied the opportunity to compete for admission to Yale on equal footing with other applicants on the basis of race or ethnicity because of Yale's discriminatory admissions policies.

8.     Applicant is ready and able to apply to transfer to Yale when it stops discriminating against applicants on the basis of race and ethnicity.

9.     Defendant Yale University, also known as the President and Fellows of Yale College, is a private university located in New Haven, Connecticut, within this judicial district.

10.     Defendant Yale receives federal financial assistance, including from the United States Department of Justice and other agencies. For example, the Department of Health and Human Services alone provides over $630 million in financial assistance to Yale University each year.

11.     As a recipient of federal funds, Yale is responsible for ensuring—and it has made contractual assurances that it will ensure—that the programs or activities to which it distributes those funds comply with federal law, including Title VI.

## FACTUAL ALLEGATIONS

### The History of Yale's Admissions System

12.     The discriminatory history of Yale's admissions process has been well documented. *See, e.g.*, Jerome Karabel, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton* (2005).

13.     Until the 1920s, Yale admitted students almost entirely on the basis of academic criteria.

14.     But this changed in the 1920s when the "wrong" students began passing the exams and being admitted. Yale leaders realized that a system of selection focused solely on scholastic performance would lead to the admission of increasing numbers of Jewish students, most of them of Eastern European background.

15.     Yale was "deeply worried about the rising number of Jewish students, and in 1921-1922 it began to discuss how it should respond." That year, over 13 percent of admitted freshmen were Jewish—the highest figure in Yale's history.

16.     Yale leaders believed that the character of the university would suffer if too many Jewish students were admitted. Yale wanted to avoid any perception that it had been "taken over" by Jews.

17.     According to Robert Nelson Corwin, the chairman of Yale's Board of Admissions, "Jewish boys" were "[a]lien in morals and manners," lacked the "ethical code" of their fellow students, and tended to "tak[e] . . . all that is offered or available and giv[e] little or nothing in return."

18.     When one Yale alumni complained about the number of Jewish students from Connecticut admitted to Yale, Corwin agreed that the list of such students "reads like some of the

'begat' portions of the Old Testament and might easily be mistaken for a recent roll call at the Wailing Wall." Corwin assured the alumni that Yale was looking into the issue and this "racial problem [was] never wholly absent from the minds of the Board of Admissions."

19.    Corwin wanted to create an admissions policy that would allow Yale to stem the "infiltration" of Jewish students to Yale.

20.    Corwin believed that a quota system that limited "the number of Jews admitted to something below 10%" would be the simplest policy. But he knew that an explicit quota on the basis of race would draw criticism.

21.    Corwin also knew that more rigorous academic criteria would not lead to a reduction in the proportion of Jewish students entering Yale. According to Corwin, "[n]o college or school seems to have discovered or devised any general criteria which will operate to exclude the undesirable and uneducable member of this race. All which have been successful in their purpose have had to avail themselves of some agency or means of discrimination based on certain *non-intellectual* requirements."

22.    Corwin also recognized that relying solely on any single factor—especially one that could be measured, like academic excellence—would deny Yale control over the composition of the freshman class.

23.    Corwin's proposal (which Yale adopted) was to create an entirely new system of admissions. The new policy would focus on applicants' "personality" and "character." These qualities were "thought to be in short supply among Jews but present in abundance among high-status Protestants."

24.    The benefits of the new system were "discretion and opacity." Yale had total discretion—it "would be free to do what [it] wished." And the new system was opaque—by

focusing on subjective qualities, how Yale "used [its] discretion would not be subject to public scrutiny."

25.     By emphasizing the "inherently subjective character of admissions decisions," the new system allowed Yale to admit and reject whoever it wished.

26.     Through this new system, Yale began systematically discriminating against Jewish students in the admissions process.

27.     Yale's official policy of discrimination, however, was "a closely kept secret." For example, in 1930, just 8.2 percent of the class was Jewish. That year, Corwin wrote to President James Angell, boasting that Yale had restricted the number of Jewish students without drawing attention to the university. Yale had limited the number of Jewish students "without hue and cry and without any attempt on the part of those chiefly affected to prove that Yale had organized a pogrom."

28.     When criticized for its policies, Yale insisted that it was not engaging in racial discrimination. According to Yale President Charles Seymour, Yale had no "rigid quota" on Jewish students and, in fact, annually admitted a "substantial number of Jewish boys." Yale limited the number of certain students only "to keep the various elements in the incoming class in some rough approximation to the proportion which obtain throughout the national population." This policy, President Seymour insisted, actually was "of clear benefit to the Jewish students at Yale."

29.     Yale's new admissions system worked as planned. The new policy kept "the Jewish enrollment from returning to its peak of 13.3 percent in 1925 and 1927 for well over thirty years."

30.     The basic tenets of Yale's "holistic" admissions policy continue today. Yale emphasizes the subjective nature of its process, labeling its decisions as "hunchy judgment[s]" into a student's capacity for leadership. Yale stresses that it makes admissions decisions not by "purely

numerical factors such as grade point averages and standardized test scores," but instead by "consider[ing] many factors, including race and ethnicity." Using race in the admission process, Yale believes, benefits all students because it allows Yale to "examine all aspects of individual applicants" and create a "mix of students that will best foster intellectual growth."

### The United States' Investigation

31.     In 2016, the United States Department of Justice received a complaint from a coalition of over 130 Asian-American organizations alleging that Yale discriminates against Asians in Yale's undergraduate admissions to Yale College.

32.     On April 5, 2018, the United States notified Yale that the United States had commenced a Title VI investigation into alleged discrimination in Yale's undergraduate admissions to Yale College.

33.     On August 13, 2020, the United States notified Yale that Yale was in violation of Title VI by discriminating on the basis of race and national origin in its undergraduate admissions.

34.     The United States offered Yale an opportunity for voluntary compliance without litigation. Yale declined the United States' offer. The United States notified Yale of its determination that efforts to obtain voluntary compliance were unsuccessful.

35.     On October 8, 2020, the United States filed a complaint in this Court laying out in detail the results of its investigation and documenting Yale's discrimination on the basis of race in its admissions process. *See United States v. Yale Univ.*, No. 3:20-cv-1534 (D. Conn. 2020). The United States' findings are detailed below.

### Yale

36.     Yale University was founded in 1701 as the "Collegiate School." In 1718, the Collegiate School became Yale College in honor of Elihu Yale.

37.     Yale is a large university with a wide array of programs, departments, schools, centers, museums, and many affiliated organizations.

38.     Yale is a member of the Ivy League, and includes a highly selective undergraduate college, Yale College, with a total enrollment of over 6,000 undergraduates.

## Yale's Historical Use of Race

39.     Yale began preferring certain races over others among applicants by at least the 1970s.

40.     In or about the 1970s, Yale defined racially-favored applicants as Black, Hispanic, American Indian, and Asian.

41.     In or about 1986, Yale's admissions documents show that it sought for "minority students [ ] to occupy a certain preset percentage of all available places" at Yale College.

42.     In approximately the late 1980s, Yale removed most Asian applicants from its list of racially-favored groups.

43.     Yale subsequently abandoned acknowledgement of such explicit "preset" quotas. However, Yale continues to subject applicants to discrimination on the ground of race.

44.     Yale admits that it intentionally uses race in admissions.

45.     Yale has stated that it "considers it a plus factor if a candidate identifies as a member of an underrepresented racial/ethnic group."

## Yale's Admissions Process

46.     Every year, tens of thousands of high school students apply for admission to Yale College.

47.     For example, in the 2018-2019 admissions cycle, Yale received over 35,000 applications for admission to Yale College. Yale extended offers of admission to approximately

2,200 applicants. Of those, approximately 1,560 applicants accepted offers of admission to attend Yale College in the fall of 2019.

48.     Yale's application process involves multiple steps.

49.     Yale applicants must submit electronically an application containing, among other items: a completed application form; a school report, including a high school transcript; standardized test scores, including either SAT or ACT test results; letters of recommendation; and essays and/or responses to short answer questions.

50.     The application forms used by Yale invite applicants to identify their race and ethnicity.

51.     If an applicant declines to identify the applicant's race, Yale may make its own determination of an applicant's race from any materials submitted in an application and/or from in-person interviews.

52.     Yale tracks each applicant's race.

53.     At each step of Yale's admissions process, the Yale admissions official evaluating an applicant knows the applicant's race if it is identified in any portion of the applicant's application.

54.     Yale treats applicants differently based on their race. Yale favors some applicants because of their race. Yale penalizes other applicants because of their race.

55.     Racially-favored applicants include applicants who identify, at least in part, as Black, Hispanic, Native American, or Pacific Islander.

56.     Racially-favored applicants also include applicants who identify, at least in part, as belonging to a favored Asian-American subgroup, such as applicants who identify as Cambodian, Hmong, Laotian, or Vietnamese.[1]

57.     Racially-penalized applicants include applicants who identify as Asian and/or White.

58.     Yale uses a multi-step admissions process through which domestic, non-transfer applicants must pass to be admitted to Yale College.

59.     Yale follows its multi-step process during two different admission processes each admissions cycle—an early admissions process and a regular admissions process.

60.     The early admissions process occurs from approximately November 1 to approximately December 15, and the regular admissions process occurs from approximately January 2 to approximately April 1.

61.     Applicants who apply during the early admissions process may be accepted, rejected, or deferred to the regular admissions process.

62.     Applicants who apply during the regular admissions process may be accepted, rejected, or placed on a waitlist.

63.     The deadline for students admitted through both the early admissions process and the regular decision process to accept Yale's admissions offer is approximately May 1.

64.     Waitlisted applicants may be offered admission to Yale College if slots are available in the entering first-year class after admitted applicants notify Yale whether they accept Yale's admission offer.

---

[1] Hereinafter, references to Asian applicants will exclude racially-favored Asian applicants who identify, at least in part, as from a favored Asian-American subgroup, such as applicants who identify as Cambodian, Hmong, Laotian, or Vietnamese.

**The "Reader" Process**

65.     Yale has divided the domestic and international areas from which it receives applications into approximately 30 areas, including approximately 22 domestic areas, to which an admissions officer referred to as an "Area Officer" is assigned.

66.     Admissions officers are assigned to teams, including a diversity team that reviews applications submitted by racially-favored applicants and a subset of racially-penalized applicants whom Yale has determined to be from a low-income background or the first in the applicant's family to potentially attend college.

67.     Admissions officers serve as "readers" who review each applicant's file. Yale refers to these reviews as "reads."

68.     An application must receive at least two reads for an applicant to be admitted to Yale. An application may receive as many as three reads.

69.     Yale refers to the admissions officer who performs the first read as the "First Reader." The Area Officer typically conducts the first read on applications from the officer's area.

70.     The First Reader knows the applicant's race if it is identified in the applicant's application.

71.     Yale instructs First Readers to consider an applicant's race when reviewing each application. First Readers follow and act on Yale's instruction about the use of race.

72.     First Readers assign applicants an overall reader rating of 1 to 4, including some plus or minus options, with "1" being the best rating. First Readers may also assign a 5 if an application file is incomplete. Ratings with a "+" (plus sign) after a number are better than a rating without a "+." For example, a 2+ is a better rating than a 2, and a 2++ is a better rating than a 2+.

Ratings with a "-" (minus sign) after a number are worse than a rating without a "-" (minus sign). For example, a 2- is a worse rating than a 2.

73.     Yale instructs First Readers to treat the race of a racially-favored applicant as a positive factor when assigning overall reader ratings. First Readers follow and act on Yale's instruction about the use of race.

74.     First Readers consider race to be a positive factor when assigning an overall reader rating to Yale's racially-favored applicants.

75.     First Readers are significantly more likely to assign racially-favored applicants a better overall rating of 2+ or 2 than similarly-situated racially-penalized applicants.

76.     First Readers significantly favor racially-favored applicants when assigning overall reader ratings because of the applicants' race and significantly penalize racially-disfavored applicants when assigning overall reader ratings because of the applicants' race.

77.     Yale refers to the admissions officer who performs the second read as the "Second Reader."

78.     First Readers have broad discretion to determine which applications the First Reader will refer for a second read.

79.     If an application does not receive a second read, Yale rejects the applicant.

80.     First Readers generally refer applications for a second read if the First Reader has assigned the application an overall reader rating of 2 or better.

81.     First Readers generally do not refer applications for a second read if the First Reader has assigned the application an overall reader rating below 2.

82.     Yale instructs First Readers to refer applications from racially-favored applicants for a second read by the diversity team during the early admissions process if the First Reader

assigned the applicant an overall reader rating of 2- or above. First Readers follow and act on Yale's instruction about the use of race.

83.     Yale instructs First Readers to refer applications from racially-penalized applicants for a second read by the diversity team during the early admissions process if the First Reader assigned the applicant an overall reader rating of 2- or above only if the racially-penalized applicant is from a low-income background or the first in the applicant's family to potentially attend college. First Readers follow and act on Yale's instruction about the use of race.

84.     First Readers generally refer applications from racially-favored applicants for a second read by the diversity team during the early admissions process if the First Reader assigned the applicants an overall reader rating of 2-.

85.     First Readers generally do not refer applications from racially-penalized applicants for a second read by the diversity team during the early admissions process if the First Readers assigned the applicants an overall reader rating of 2-.

86.     First Readers are much more likely to refer racially-favored applicants whom they assigned an overall rating of 2- for a second read during the early admissions process than First Readers are to refer racially-penalized applicants whom they assigned an overall rating of 2- during the early admissions process.

87.     The Second Reader knows the applicant's race if it is identified in the applicant's application.

88.     Yale instructs Second Readers to consider an applicant's race when reviewing each application. Second Readers follow and act on Yale's instruction about the use of race.

89.     Second Readers assign applicants an overall reader rating according to the same number rating scale as First Readers.

90.     Yale instructs Second Readers to treat the race of a racially-favored applicant as a positive factor when assigning overall reader ratings. Second Readers follow and act on Yale's instruction about the use of race.

91.     Second Readers consider race to be a positive factor when assigning an overall reader rating to Yale's racially-favored applicants.

92.     Second Readers are significantly more likely to assign racially-favored applicants a better overall rating of 2+ or 2 than similarly-situated racially-penalized applicants.

93.     Second Readers significantly favor racially-favored applicants when assigning overall reader ratings because of the applicants' race and significantly penalize racially-penalized applicants when assigning overall reader ratings because of the applicants' race.

94.     Yale includes the overall reader rating of every reader who reviews an application in materials considered by the admissions committees described below.

### The Committee Process

95.     Once the reading process is complete, an "Area Committee" meets for each area to review applications received from that area.

96.     Area Committees meet during both the early admissions process and the regular admissions process.

97.     Yale maintains a list of applicants from each area. Yale refers to this list as the area "slate."

98.     The slate includes all reader overall ratings.

99.     The slate includes each applicant's race, if known.

100.    Area Officers have a copy of their area slate.

101.    Area Officers select applicants from their slate to present to their Area Committee.

102.   Yale instructs Area Officers to treat the race of a racially-favored applicant as a positive factor when selecting applicants to present to their Area Committee. Area Officers follow and act on Yale's instruction about the use of race.

103.   Area Officers consider the race of a racially-favored applicant to be a positive factor when selecting applicants to present to their Area Committee. Area Officers consider the race of a racially-penalized applicant to be a negative factor when selecting applicants to present to their Area Committee.

104.   Area Officers present each of their selected applicants to their Area Committee for evaluation.

105.   Area Committees may request to discuss applicants listed on the slate whom the Area Officer has not presented.

106.   During the early admissions process, Area Committees vote whether to admit or reject, or to defer for consideration during the regular decision process, each applicant presented to the Area Committee.

107.   During the regular admissions process, Area Committees vote whether to admit, reject, or waitlist each applicant presented to the Area Committee.

108.   Yale instructs members of Area Committees to treat the race of a racially-favored applicant as a positive factor when voting on applicants. Members of Area Committees follow and act on Yale's instruction about the use of race.

109.   Area Officers consider the race of racially-favored applicants to be a positive factor when voting on applicants.

110.   Area Committees consider race in order to achieve a class with a racial composition similar to the racial composition of the class from the prior admissions cycle.

111.    Area Committees admit racially-favored applicants at a significantly higher rate than they admit similarly-situated racially-penalized applicants.

112.    Area Committees admit racially-favored applicants at a significantly higher rate than they admit similarly-situated racially-penalized applicants because the Area Committees subject applicants to discrimination on the ground of their race.

113.    After the Area Committees vote on applicants during the regular admissions process, Yale's admissions office determines whether the number of applicants admitted by the Area Committees exceeds the number of available slots for the incoming class.

114.    After the Area Committees vote on applicants during the regular admissions process, Yale's admissions office analyzes the racial composition of the admitted applicants.

115.    Based on the racial analysis discussed in paragraph 114, Yale's Dean of Admissions determines whether the racial composition of the admitted applicants needs to be adjusted to achieve Yale's desired racial balance.

116.    Yale's Dean of Admissions informs the Area Officers of the racial composition of the applicants admitted by the Area Committees.

117.    Yale's Dean of Admissions informs each Area Officer how many admitted applicants need to be waitlisted or rejected from their area.

118.    Yale may reconsider an Area Committee's decision to admit an applicant and change the decision from admit to either waitlist or reject. Yale refers to this as "bopping."

119.    A "Final Review Committee" reconsiders Area Committee votes to accept, reject, or waitlist applicants.

120.    The Final Review Committee may vote to waitlist or reject applicants whom an Area Committee admitted.

121.   The Final Review Committee may vote to admit applicants whom an Area Committee voted to waitlist or reject.

122.   Area Officers select applicants to present to the Final Review Committee for reconsideration.

123.   Yale instructs Area Officers to treat the race of a racially-favored applicant as a positive factor when selecting applicants to present to the Final Review Committee. Area Officers follow and act on Yale's instruction about the use of race.

124.   Area Officers consider the race of a racially-favored applicant to be a positive factor when selecting applicants to present to the Final Review Committee. Area Officers consider the race of a racially-penalized applicant to be a negative factor when selecting applicants to present to the Final Review Committee.

125.   Area Officers present their selected applicants to the Final Review Committee for evaluation.

126.   The Final Review Committee may request to discuss applicants on the slate whom the Area Officer has not presented.

127.   The Final Review Committee votes to waitlist or reject applicants whom the Area Committees voted to admit.

128.   The Final Review Committee votes to admit applicants whom the Area Committees voted to waitlist or reject.

129.   Yale instructs members of the Final Review Committee to treat the race of a racially-favored applicant as a positive factor when voting on applicants. Members of the Final Review Committee follow and act on Yale's instruction about the use of race.

130.    Members of the Final Review Committee consider race to be a positive factor when voting on racially-favored applicants.

131.    Members of the Final Review Committee consider race to be a negative factor when voting on racially-penalized applicants.

132.    The Final Review Committee uses race to admit racially-favored applicants to achieve a racially-balanced class.

133.    The Final Review Committee uses race during a "bopping" process which is one of several points during the admissions process when Yale takes steps to achieve a racially balanced class.

134.    Yale has "bopped" racially-penalized applicants based on race to admit more racially-favored applicants and racially balance Yale's admitted class.

**The Admitted Class Composition and Admit Rates**

135.    Yale's racially-favored applicants predominantly include applicants who identify as Black and/or Hispanic.

136.    The United States Department of Education's National Center for Education Statistics maintains the Integrated Postsecondary Education Data System (IPEDS) for postsecondary education data collection.

137.    IPEDS requires postsecondary institutions to use a two-part question to collect and report ethnicity and race data. The first part of the question collects ethnicity and asks whether the applicant is "Hispanic or Latino." The second part of the question collects race and asks whether the applicant is one or more of five listed racial categories.

138.    If an applicant identifies as "Hispanic or Latino," IPEDS categorizes the applicant as "Hispanic" regardless of whether the applicant also identifies as one or more of the racial

categories. If the applicant identifies as only one of the listed racial categories, the applicant is categorized as that racial category. If the applicant identifies as more than one of the racial categories, the applicant is categorized as "Two or more races." If the applicant does not identify an ethnicity or race, the applicant is categorized as "Unknown race and ethnicity."

139.    Each year for 18 consecutive years, from 2000 to 2017, data on domestic applicants and admits using the IPEDS methodology show that the percentage of Black and Hispanic applicants admitted to Yale College was higher than the percentage of Black and Hispanic applicants to Yale College.

140.    Each year for 18 consecutive years, from 2000 to 2017, data on domestic applicants and admits using the IPEDS methodology show that the percentage of Asian applicants admitted to Yale College was lower than the percentage of Asian applicants to Yale College.

141.    For a majority of years from 2000 to 2017, data on domestic applicants and admits using the IPEDS methodology show that the percentage of White applicants admitted to Yale College was lower than the percentage of White applicants to Yale College.

142.    From 2010 through 2017, Yale engaged in racial balancing of domestic admits by keeping the annual percentage of Black admits within approximately one percentage point of the previous year's admitted class in the IPEDS data.

143.    From 2010 through 2017, Yale engaged in racial balancing of domestic admits by keeping the annual percentage of Asian admits within approximately 1.5 percentage points of the previous year's admitted class in the IPEDS data. Indeed, in most years the range was only one percentage point or less.

144.    For Black and Asian applicants, and possibly others, Yale uses race to keep the percentage of the admitted applicants within a very narrow range in order to ensure a racially-

balanced student body. In doing so, Yale subjects applicants to discrimination on the ground of race.

145.    In addition to the IPEDS methodology, Yale uses a single ethnicity method of tracking applicants' race in which it categorizes applicants in four major racial groups who identify as more than one race in the following order: Black, Hispanic, Asian, and White. Using this method, if an applicant identifies as both Black and White, Yale's single ethnicity method would categorize the applicant as Black.

146.    In 2017 and 2018 (years for which Yale provided data during the Department of Justice's investigation), the admit rates of domestic, non-transfer applicants varied by racial group using Yale's single ethnicity method. Black applicants had the highest admit rate followed by Hispanic applicants. Asian and White applicants had the lowest admit rates.

147.    In 2017 and 2018, the admit rates of domestic, non-transfer applicants with a First Reader overall rating of 2 or better (i.e., 2, 2+, 2++, 1) varied by racial group using Yale's single ethnicity method. Among these applicants, Black applicants had the highest admit rate, followed by Hispanic applicants. Asian and White applicants had the lowest admit rates of applicants with a First Reader overall rating of 2 or better.

148.    Most successful applicants to Yale College receive a rating of a 2 or 2+, and Yale subjects such applicants to discrimination on the ground of race in multiple ways. First, Yale uses race significantly when it determines who will receive a rating of 2 or 2+. Second, Yale uses race significantly when it determines whether to extend offers of admission to applicants who receive a rating of 2 or 2+.

149. On the ground of race, Yale admits applicants with the same reader scores at different rates. For example, Yale admits a greater percentage of Blacks having reader scores of 2, as compared to Asians having reader scores of 2.

150. Yale treats applicants whom it ranks as equal—applicants having the same overall reader scores—differently on the grounds of race. It discriminates against Asians and Whites, and in favor of Black and Hispanics having the same reader scores.

### The Academic Index

151. Yale stresses academic strength of applicants when it evaluates applicants and makes decisions about applicants to Yale College.

152. Yale's website explains: "Yale is above all an academic institution. This means academic strength is our first consideration in evaluating any candidate. The single most important document in your application is your high school transcript, which tells us a great deal about your academic drive and performance over time." https://admissions.yale.edu/what-yale-looks-for (Last visited February 24, 2021).

153. Yale uses standardized test scores to evaluate applicants to Yale College.

154. Yale's website states: "During the most recent year, test score ranges (25th to 75th percentiles) for enrolled first-years were:

      SAT-Evidence-Based Reading and Writing: 720-770

      SAT-Math: 740-790

      ACT Composite: 33-35

https://admissions.yale.edu/what-yale-looks-for (Last visited February 24, 2021).

155.    The Academic Index is a consistent objective standard used by all Ivy League schools, including Yale. It uses an objective mathematical formula based on a combination of each applicant's SAT or ACT score and the applicant's high school grades.

156.    An Academic Index rating can be calculated for each applicant to Yale College who provided standardized test scores and high school grades.

157.    Yale uses the Academic Index as a metric to determine, at least in part, whether to offer admission to at least a subset of Yale College applicants. For each such applicant, Yale calculates an Academic Index rating.

158.    Applicants with a higher Academic Index rating have a higher chance of admission to Yale College than applicants with a lower Academic Index rating.

159.    Applicants to Yale College differ significantly in their admission chances based on their race and Academic Index rating.

160.    Dividing Yale's applicants into deciles using Academic Index ratings, with each decile equal to approximately 10% of the applicants, shows the significant differences between applicants' chances for admission to Yale College based on their race.

161.    To illustrate, for example, the Tenth Academic Index Decile includes applicants to Yale with approximately the top 10% of Academic Index ratings, greater than the Academic Index ratings of approximately 90% of applicants.

162.    To illustrate, for example, the Sixth Academic Index Decile includes applicants to Yale with approximately the top 50-60% of Academic Index Ratings, greater than the Academic Index ratings of approximately 50% of applicants and less than the Academic Index ratings of approximately 40% of applicants.

163.    The admit rates vary significantly for Asian, Black, Hispanic, and White applicants in the same Academic Index Decile.

164.    The admission rates of White, Asian, Black, and Hispanic applicants are depicted on the following table and show significant discrimination on the ground of race.

| Admission Rate by Race/Ethnic Group and Academic Index Decile | | | | | |
|---|---|---|---|---|---|
| Deciles | White % admitted Total in decile Total admitted | Asian % admitted Total in decile Total admitted | Black % admitted Total in decile Total admitted | Hispanic % admitted Total in decile Total admitted | Total % admitted Total in decile Total admitted |
| 10th | 20.18% (1,526) [308] | 14.32% (2,836) [406] | 60.00% (50) [30] | 34.84% (155) [54] | 17.47% (4,576) [798] |
| 9th | 12.12% (2,137) [259] | 8.17% (2,190) [179] | 51.69% (89) [46] | 28.77% (292) [84] | 12.06% (4,708) [568] |
| 8th | 8.40% (2,225) [187] | 6.20% (1,614) [100] | 48.99% (149) [73] | 21.12% (303) [64] | 9.88% (4,291) [424] |
| 7th | 7.23% (2,545) [184] | 5.29% (1,625) [86] | 38.63% (233) [90] | 22.63% (433) [98] | 9.47% (4,836) [458] |
| 6th | 6.53% (2,311) [151] | 3.83% (1,489) [57] | 27.95% (297) [83] | 18.02% (455) [82] | 8.19% (4,552) [373] |
| 5th | 4.09% (2,301) [94] | 3.54% (1,299) [46] | 20.85% (422) [88] | 13.30% (669) [89] | 6.76% (4,691) [317] |
| 4th | 2.02% (2,273) [46] | 2.49% (1,165) [29] | 12.14% (618) [75] | 5.94% (892) [53] | 4.10% (4,948) [203] |
| 3rd | 0.95% (1,678) [16] | 0.92% (867) [8] | 5.49% (819) [45] | 2.61% (918) [24] | 2.17% (4,282) [93] |
| 2nd | 0.79% (1,522) [12] | 0.50% (806) [4] | 1.46% (1,233) [18] | 0.85% (1,298) [11] | 0.93% (4,859) [45] |

| 1st | 0.38%<br>(1,063)<br>[4] | 0.50%<br>(599)<br>[3] | 0.11%<br>(1,847)<br>[2] | 0.07%<br>(1,350)<br>[1] | 0.21%<br>(4,859)<br>[10] |
|---|---|---|---|---|---|

165. The data in paragraph 164 are for Yale's 2017 and 2018 admissions classes of domestic, non-transfer applicants, and excludes athletes (who are subject to a different admissions process), those for whom an academic index could not be calculated, applicants without a First Reader Score, and applicants not categorized using Yale's single ethnicity method as White, Asian, Black, or Hispanic.

166. For example, the data show the following admit rates of applicants to Yale College in the Eighth Academic Index Decile for admission in 2017 and 2018: 8.40% for White applicants; 6.20% for Asian applicants; 48.99% for Black applicants; and 21.12% for Hispanic applicants. The overall admit rate for applicants to Yale College in the Eighth Academic Index Decile was 9.88%. Black applicants in the Eighth Academic Index Decile had nearly 8 times the likelihood of admission as Asian applicants in the same decile.

167. Similarly, for example, the data show the following admit rates of applicants to Yale College in the Sixth Academic Index Decile for admission in 2017 and 2018: 6.53% for White applicants; 3.83% for Asian applicants; 27.95% for Black applicants; and 18.02% for Hispanic applicants. The overall admit rate for applicants to Yale College in the Sixth Academic Index Decile was 8.19%. Black applicants in the Sixth Academic Index Decile had over 7 times the likelihood of admission as Asian applicants in the same decile.

168. The other deciles show similar disparities by race and ethnicity

169. The variation in admit rates for Asian, Black, Hispanic, and White applicants in the same Academic Index decile reflect Yale's significant and untailored use of race, and is not the result of Yale using race as just a "plus factor" in a narrowly tailored way. Race is the determinative

factor in many admissions decisions and often determines who is accepted and who is rejected for admission.

## The Marginal Effect of Race

170.    Yale subjects Yale College applicants to discrimination on the ground of race at virtually every step of its admissions process.

171.    Nearly all applicants admitted to Yale receive a First Reader overall rating of 2 or better (i.e., 2, 2+, 2++, 1). Most admitted applicants receive a rating of 2 or 2+.

172.    Yale discriminates at the First Reader stage of its admissions process. Significant disparities exist between the First Reader overall ratings assigned to racially-favored applicants and the First Reader overall ratings assigned to similarly-situated racially-penalized applicants.

173.    Significant disparities exist between the First Reader overall ratings assigned to racially-favored applicants and the First Reader overall ratings assigned to similarly-situated racially-penalized applicants because Yale instructs readers to favor racially-favored applicants, and thereby penalize racially-penalized applicants, when assigning these ratings. Readers follow and act on Yale's instruction about the use of race.

174.    These significant disparities in First Reader overall ratings are excessive, and not the result of Yale using race as just a "plus factor" in a narrowly tailored way.

175.    Yale discriminates at the Second Reader stage of its admissions process. Significant disparities exist between the Second Reader overall ratings assigned to racially-favored applicants and the Second Reader overall ratings assigned to similarly-situated racially-penalized applicants.

176.    Significant disparities exist between the Second Reader overall ratings assigned to racially-favored applicants and the Second Reader overall ratings assigned to similarly-situated racially-penalized applicants because Yale instructs readers to favor racially-favored applicants,

and thereby penalize racially-penalized applicants, when assigning these ratings. Readers follow and act on Yale's instruction about the use of race.

177.    These significant disparities in Second Reader overall ratings are excessive, and not the result of Yale using race as just a "plus factor" in a narrowly tailored way.

178.    Yale discriminates on the ground of race between applicants its admissions officers view as otherwise comparable.

179.    This discrimination between comparable applicants produces a significant, excessive, untailored effect on the admission chances for competitive applicants whom Yale's readers rated as a 2 or 2+.

180.    For example, the admit rates of applicants with a First Reader overall rating of 2 vary significantly based on race. The admit rates of Asian and White applicants with a First Reader overall rating of 2 are significantly lower than the admit rates of Black and Hispanic applicants with a First Reader overall rating of 2.

181.    Similarly, the admit rates of applicants with a First Reader overall rating of 2+ vary significantly based on race. The admit rates of Asian and White applicants with a First Reader overall rating of 2+ are significantly lower than the admit rates of Black and Hispanic applicants with a First Reader overall rating of 2+.

182.    That is, applicants whom Yale's own readers rate as comparable after factoring in race are admitted at significantly different rates based on race.

183.    Yale is significantly less likely to admit Asian and White applicants to Yale College than similarly-situated Black and Hispanic applicants.

184.    The marginal effect of race on the probability of admission for comparable applicants is outcome determinative for hundreds of applicants each admissions cycle.

185.    Because Yale subjects applicants to discrimination on the ground of race, Yale annually rejects hundreds of Asian and White applicants to Yale College who could have been admitted.

## No Time Limits

186.    Yale has subjected applicants to Yale College to discrimination on the ground of race for at least 50 years.

187.    Since Yale started using race in admissions, Yale has not narrowly tailored its use of race and the weight race plays in admission decisions.

188.    Yale intends to continue subjecting applicants to discrimination on the ground of race in admissions to Yale College.

189.    Yale has not placed any time limits on its racially discriminatory admissions process, and Yale does not intend to do so.

190.    Instead of using race in a narrow, time-limited, and targeted manner to achieve specific and defined educational goals, Yale has institutionalized its use of racial preferences as a permanent feature of its admissions process and decisions.

## Race Neutral Alternatives

191.    Yale has not employed available, workable race-neutral alternatives to the use of race.

192.    Yale has failed or refused to use available, workable race-neutral alternatives to the use of race.

193.    Yale could achieve the educational benefits of diversity exclusively through available, workable race-neutral alternatives.

194.    For example, Yale could emphasize the socio-economic status of applicants as a factor in admissions to achieve the educational benefits of diversity and eliminate Yale's use of race.

195.    Alternatively, Yale could emphasize diversity in applicants' location in the United States, including an emphasis on an array of applicants from inner cities to rural communities, to achieve the educational benefits of diversity and eliminate Yale's use of race.

196.    Another option would be for Yale to emphasize applicants' personal, individual challenges accessing educational opportunities to achieve the educational benefits of diversity and eliminate Yale's use of race.

197.    Finally, Yale could eliminate its favoring of legacies, donors, and other special interest applicants to achieve the educational benefits of diversity and eliminate Yale's use of race.

198.    But despite these examples and other available, workable race-neutral alternatives, Yale continues unnecessarily to use race in its undergraduate admissions to Yale College.

**Yale Is a Recipient of Federal Financial Assistance**

199.    At all relevant times described in this complaint, Yale has been, and continues to be, a recipient of federal financial assistance from the United States Department of Justice and other federal agencies.

200.    By accepting federal financial assistance, Yale agreed to comply with all requirements imposed by Title VI and the federal regulations implementing Title VI.

201.    As a condition of receiving federal financial assistance, Yale explicitly certified it agreed to comply with all requirements imposed by Title VI and the federal regulations implementing Title VI.

202.    On August 13, 2020, the United States notified Yale that it had failed to comply with Title VI, its implementing regulations, and related contractual assurances. That August 13, 2020 notice also invited Yale to comply voluntarily with Title VI.

203.    The United States subsequently determined that efforts to obtain voluntary compliance were unsuccessful.

204.    The United States notified Yale of its determination that efforts to obtain voluntary compliance were unsuccessful.

205.    On February 3, 2021, the United States dismissed its complaint against Yale without explanation. The United States has never stated that the facts it alleged in its complaint filed in this Court were wrong or inaccurate.

## COUNT I

**Violation of 42 U.S.C. §2000d *et seq.***
**(Intentional Discrimination Against Asian Americans)**

206.    SFFA incorporates the allegations contained in paragraphs 1-205 as if fully set forth herein.

207.    Yale, a recipient of federal funds, intentionally discriminated against certain of SFFA's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, by employing an undergraduate admissions policy that intentionally discriminates against Asian-American applicants on the basis of race or ethnicity.

208.    Title VI is privately enforceable.

209.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds

28

210.    An institution's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular group violates the Fourteenth Amendment and therefore violates Title VI.

211.    Yale has intentionally discriminated against Asian-American applicants for admission on the basis of race or ethnicity based on prejudicial and stereotypical assumptions about their qualifications.

212.    SFFA's members have been and will continue to be injured because Yale has and will continue to deny them the opportunity to compete for admission to Yale on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

213.    SFFA is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Yale from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm SFFA's members will otherwise continue to suffer is irreparable.

214.    SFFA is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

## COUNT II

**Violation of 42 U.S.C. § 2000d *et seq.***
**(Racial Balancing)**

215.    SFFA incorporates the allegations contained in paragraphs 1-214 as if fully set forth herein.

216.    Yale, a recipient of federal funds, intentionally discriminated against certain of SFFA's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil

Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that balances the class according to its racial or ethnic composition.

217.    Title VI is privately enforceable.

218.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

219.    A university that uses its admissions system to pursue quotas or proportional representation of racial or ethnic groups either in the entering class or in the overall student body violates the Fourteenth Amendment and therefore violates Title VI.

220.    Yale is seeking proportional representation across racial and ethnic groups and therefore is engaged in racial balancing.

221.    SFFA's members have been and will continue to be injured because Yale has and will continue to deny them the opportunity to compete for admission to Yale on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

222.    SFFA is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Yale from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm SFFA's members will otherwise continue to suffer is irreparable.

223.    SFFA is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

## COUNT III

**Violation of 42 U.S.C. §2000d *et seq.***
**(Failure To Use Race Merely As A "Plus" Factor In Admissions Decisions)**

224. SFFA incorporates the allegations contained in paragraphs 1-223 as if fully set forth herein.

225. Yale, a recipient of federal funds, intentionally discriminated against certain of SFFA's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, by employing an undergraduate admissions policy that is not narrowly tailored because it does not use race merely as a "plus" factor in order to achieve student body diversity.

226. Title VI is privately enforceable.

227. Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

228. Yale is not complying with the requirement of narrow tailoring because it is not using race merely as a "plus" factor in admissions decisions in order to achieve student body diversity. Each applicant for admission is not evaluated as an individual, but instead, race is the defining feature of Yale's consideration of each application at every stage of the admission process. That is especially true for Asian-American applicants.

229. SFFA's members have been and will continue to be injured because Yale has and will continue to deny them the opportunity to compete for admission to Yale on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

230. SFFA is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Yale from continuing to use admissions policies and procedures that discriminate on the basis of race

or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm SFFA's members will otherwise continue to suffer is irreparable.

231.    SFFA is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

## COUNT IV

**Violation of 42 U.S.C. §2000d *et seq.***
**(Failure To Use Race To Merely Fill The Last**
**"Few Places" In The Incoming Freshman Class)**

232.    SFFA incorporates the allegations contained in paragraphs 1-231 as if fully set forth herein.

233.    Yale, a recipient of federal funds, intentionally discriminated against certain of SFFA's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, by employing an undergraduate admissions policy that is not narrowly tailored because it does not merely use race as a factor in filling the last "few places" in the entering freshman class.

234.    Title VI is privately enforceable.

235.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

236.    Yale is not using race merely to fill the last few places in the entering freshman class. Instead race plays a much larger role in Yale's admissions decisions—especially for Asian American students—going far beyond and affecting far more than those who are competing for the last few places in a class.

237.    SFFA's members have been and will continue to be injured because Yale has and will continue to deny them the opportunity to compete for admission to Yale on equal footing with

other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

238.    SFFA is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Yale from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm SFFA's members will otherwise continue to suffer is irreparable.

239.    SFFA is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

## COUNT V

### Violation of 42 U.S.C. §2000d *et seq.*
### (Race-Neutral Alternatives)

240.    SFFA incorporates the allegations contained in paragraphs 1-239 as if fully set forth herein.

241.    Yale, a recipient of federal funds, intentionally discriminated against certain of SFFA's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, by employing racial preferences in undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity.

242.    Title VI is privately enforceable.

243.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

244.    Yale's use of racial preferences can be narrowly tailored only if using them is necessary to achieve student body diversity. Accordingly, if Yale can achieve student body

diversity without resorting to racial preferences, it is required to do so as a matter of law. Moreover, Yale must have a strong basis in evidence that a non-racial approach will not work about as well as a race-based approach before turning to the use of racial preferences.

245.    Yale neither studied the available race-neutral alternatives, nor had a strong basis in evidence that no race-neutral alternatives would work as well as a race-based approach, before turning to racial preferences. Instead, Yale has been using racial preferences—to one degree or another—continuously for at least 50 years.

246.    Whether Yale considered them or not, there are a host of race-neutral alternatives that if implemented can achieve student body diversity without resorting to racial preferences. Among these alternatives, both individually and collectively, are (a) increased use of non-racial preferences, (b) increased financial aid, scholarships, and recruitment efforts, and (c) elimination of admissions policies and practices that negatively affect minority applicants.

247.    The use of race-neutral alternatives instead of racial preferences would not only achieve student body diversity, it would eliminate the heavy costs that using race as a factor in admissions decisions imposes on minority applicants who receive such admissions preference, the Yale community, and society as a whole.

248.    SFFA's members have been and will continue to be injured because Yale has and will continue to deny them the opportunity to compete for admission to Yale on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

249.    SFFA is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Yale from continuing to use admissions policies and procedures that discriminate on the basis of race

or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm SFFA's members will otherwise continue to suffer is irreparable.

250.    SFFA is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

## COUNT VI

**Violation of 42 U.S.C §2000d *et seq.*
(Any Use of Race As A Factor In Admissions)**

251.    SFFA incorporates the allegations contained in paragraphs 1-250 as if fully set forth herein.

252.    Yale, a recipient of federal funds, intentionally discriminated against certain of SFFA's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, by employing an undergraduate admissions policy that uses race as a factor in admissions.

253.    Title VI is privately enforceable.

254.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

255.    The Supreme Court's decisions holding that there is a compelling government interest in using race as a factor in admissions decisions in pursuit of "diversity" should be overruled. Those decisions were wrongly decided at the time they were issued and they remain wrong today. "Diversity" is not an interest that could ever justify the use of racial preferences under the Fourteenth Amendment and Title VI.

256.    Even if there were a compelling government interest in "diversity" in the abstract, however, the use of racial preferences in the educational setting nevertheless should be forbidden for several important reasons.

257.    The Supreme Court's jurisprudence in this area has been built on mistakes of fact and law. The Supreme Court first accepted the use of racial preferences in admissions on the assumption that they would be used merely as a contextual factor in filling the final few places in the entering class. But it is far from certain that Yale has ever used race in the way the Supreme Court envisioned. "The raison d'être for race-specific affirmative action programs has simply never been diversity for the sake of education." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 407 (1979). It is instead "a clever post facto justification for increasing the number of minority group students in the student body." *Id.*

258.    In any event, neither Yale nor any other college or university uses race in this manner now. Instead, colleges and universities, including Yale, are pursuing racial balancing, seeking to ensure a proportional number of students of certain races or ethnicities in the entering class.

259.    Ultimately, there is overwhelming evidence that colleges and universities will take advantage of any leeway given by the Supreme Court to use the dangerous tool of racial preferences in inappropriate ways. The experience with Yale confirms that, if given the chance, colleges and universities will use racial preferences "for the ostensible purpose of enhancing education diversity of the student body" with the true "goal of simply increasing the number of minority persons in the universities and in the professions that these universities feed." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

260.    There simply is no practical way to ensure that colleges and universities will use race in their admissions processes in any way that would meet the narrow tailoring requirement.

The strong medicine of strict scrutiny has proven insufficient to ensure that the Fourteenth Amendment and Title VI operate in conformity of racial neutrality except in those rare circumstances that justify the use of this disfavored remedy. Time after time, district courts and the courts of appeals have been either unwilling or unable to force these colleges and universities to provide a strong evidentiary basis for their conclusion that use of racial preferences is necessary to achieve diversity. Nor have they been willing to engage in the close review of admissions programs to ensure that schools are treating each applicant as an individual.

261.    There also have been important factual developments since this question was last considered by the Supreme Court. There is now much evidence that race-neutral alternatives can achieve the benefits of diversity. This is crucially important in light of the equally compelling evidence that racial preferences impose significant costs on the university community, society in general, and even the very minority students these programs are purported to benefit.

262.    In the end, the costs of allowing the use of racial preferences in admissions decisions—even in a limited way—far exceed any rapidly diminishing benefits. No principle of stare decisis counsels in favor of retaining decisions allowing their use. Those decisions were not well reasoned, were predicated on mistakes of fact, have been undermined by more recent developments, and have proven to be unworkable. Any decision allowing the use of racial preferences in the educational setting should be overruled.

263.    SFFA's members have been and will continue to be injured because Yale has and will continue to deny them the opportunity to compete for admission to Yale on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

264.    SFFA is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Yale from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm SFFA's members will otherwise continue to suffer is irreparable.

265.    SFFA is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

**PRAYER FOR RELIEF**

WHEREFORE, SFFA prays that the Court grant the following relief:

(a)     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, from the Court that Yale's admissions policies and procedures violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*;

(b)     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, from the Court that any use of race or ethnicity in the educational setting violates the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*;

(c)     A permanent injunction prohibiting Yale from using race as a factor in future Yale College admissions decisions;

(d)     A permanent injunction requiring Yale to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission;

(e)     Attorneys' fees and costs pursuant to 42 U.S.C. §1988 and any other applicable legal authority; and

(f)     All other relief this Court finds appropriate and just.

Respectfully submitted,

Dated: February 25, 2021

/s/   J. Michael Connolly

William S. Consovoy*
J. Michael Connolly (CT29695)
Cameron T. Norris*
Steven C. Begakis*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

*Counsel for Students for Fair Admissions, Inc.*

**Pro hac vice* motion forthcoming